UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:22-cv-01050-SRC |
| | ) | |
| .55 ACRES OF LAND, MORE OR LESS, | ) | |
| SITUATED IN THE CITY OF ST. LOUIS, | ) | |
| MISSOURI, and LIBERTY PLAZA, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**Memorandum and Order**

The federal government condemned land near the VA Medical Center in St. Louis,
Missouri, and sued to establish the amount of just compensation it owes to Liberty Plaza, the
former owner of the land.  The parties sought the opinions of experts to appraise the land, and
now, the United States moves to exclude three opinions for failure to comply with *Daubert* and
Federal Rule of Evidence 702:  the expert opinion of Justin Strohm, a real-estate agent who once
listed the property for sale; the expert opinion of Linda Atkinson, an appraiser; and Liberty
Plaza's own opinion of value as the former landowner.  Because all three opinions clear the
hurdles of Rule 702, the Court denies the motions.

I.      **Background**

In September 2022, the United States exercised its power of eminent domain to take
approximately .55 acres of land at 1015 North Grand Boulevard in St. Louis, Missouri.  See
docs. 1, 1-1.  Its declaration of taking explains that the Department of Veterans Affairs plans to

use the land for an expansion of the VA Medical Center.  Doc. 1-1 at 1–4.[1]  Before the taking,

Liberty Plaza held title to the plot by general warranty deed.  *Id.* at 9.

The parties dispute the amount of just compensation due.  *See* doc. 36.  To that end, both

parties sought the support of experts regarding the property value.  Among them is Justin

Strohm, who, on behalf of Liberty Plaza, opines that the property is worth $2.1 million.  *See*

doc. 55-1, Strohm Dep. at 81:20–25.  Strohm is a real-estate broker who listed the property pre

condemnation.  *See id.* at 9:8–15, 26:3–24.  Before obtaining his real-estate brokerage license

around 2015, Strohm worked as an analyst predicting auction values of distressed properties in

the City of St. Louis.  *Id.* at 16:7–15.  Since then, he has taken continuing education courses to

maintain his real-estate brokerage licenses in Missouri and Colorado, and has assisted clients in

buying, selling, and leasing their properties.  *Id.* at 9:8–10:2.  His responsibilities include

advising clients regarding the worth of their property on the market.  *Id.* at 10:6–23.  To reach his

$2.1 million valuation of the subject property, Strohm used what he called the "market value

approach," considering the listings of two nearby properties; the year-to-date building permits in

the area, which amounted to over $104 million; and Liberty Plaza's preference to hold the

property and enter into a ground lease (rather than sell the property).  *See* doc. 49-4.  He also

testified that the highest and best use of the property is as a quick-service restaurant.  *See* doc.

55-1 at 98:4–99:6.

Liberty Plaza also presents Linda Atkinson, who testified that she values the property at

$650,000.  *See* doc. 52-3.  Atkinson is a real-estate appraiser certified to practice in Missouri and

Illinois, and first became an appraiser in 1984.  Doc. 57-1, Atkinson Dep. at 10:7–14.  Since that

time, she has worked as an appraiser in both the private and public sectors, including for national

---

[1] The Court cites to page numbers as assigned by CM/ECF.

appraisal firms, eventually becoming the managing director of an accounting firm's national appraisal practice. *Id.* at 11:19–12:25. She holds "Member of the Appraisal Institute" and "Certified Commercial Investment Member" designations, and, since formally retiring, has occasionally performed appraisal work as a contractor. *Id.* at 10:15–11:15; doc. 57-2 at 40. She has served as an expert witness in her capacity as an appraiser over 20 times, primarily in condemnation litigation. Doc. 57-1, Atkinson Dep. at 13:1–21.

To reach her $650,000 valuation in this case, Atkinson used the "sales comparison approach," doc. 52-3 at 8, which her report defines as the maximum amount a "prudent purchaser" would pay "to buy a comparable substitute property in a similar location and without undue delay," *id.* at 13. Atkinson considered four recent sales of properties she considered comparable to the subject property here. *Id.* at 14–17. She adjusted the significance she assigned to the sale price of each of the four properties on the basis of 13 elements—such as size, shape, zoning restrictions, and the like—each of which might increase or decrease the comparability of each property to the subject property. *Id.* at 18–21. Based on that comparison, Atkinson valued the subject property, which spanned 23,966 square feet, at $27.00 per square foot, yielding a valuation of $647,082 (which she rounded to $650,000). *Id.* at 22. She also concluded that the highest and best use of the property is "commercial development as demand warrants." *Id.* at 11.

Finally, Liberty Plaza presents its own opinion of the property's value through its representative, Fadi Nasser. *See* doc. 51-4, Nasser Dep. Nasser manages the property. *Id.* at 11:24–12:1; *see* Missouri Secretary of State, Missouri Business Filings, https://bsd.sos.mo.gov/Common/CorrespondenceItemViewHandler.ashx?IsTIFF=true&filedDoc umentid=3099939&version=1 (last visited Feb. 25, 2024). Liberty Plaza estimated the value of

the property at $3 million based on the size of the lot, its location in "one of the hottest areas in St. Louis," and anticipated lease revenue of $12,000 to $16,000 per month.  Doc. 51-4, Nasser Dep. at 25:21–26:11.  In considering its opinion of value, Liberty Plaza also determined that the property's highest best use would be as an apartment complex with retail outlets on the ground floor.  *Id.* at 53:2–6.

The United States now moves the Court to exclude all three opinions for failure to satisfy the requirements of Federal Rule of Evidence 702.  *See* docs. 49, 51–52.

## II.    Standard

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the United States Supreme Court interpreted the then-effective version of Rule 702 of the Federal Rules of Evidence to require district courts to be certain that expert evidence based on scientific, technical, or other specialized knowledge is "not only relevant, but reliable."  509 U.S. 579, 590 (1993).  The district court must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."  *Id.* at 592–93.

Post-*Daubert* amendments to Rule 702 clarify the standard:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

4

Fed. R. Evid. 702; *see also* Fed. R. Evid. 702 advisory committee's note to 2000 amendment ("Rule 702 has been amended in response to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, and to the many cases applying *Daubert* . . . ." (citation omitted)).

The Eighth Circuit has expounded the Rule 702 standard. Proposed expert testimony must meet three criteria to be admissible under Rule 702. "First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact. This is the basic rule of relevancy." *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001) (citation omitted). "Second, the proposed witness must be qualified to assist the finder of fact." *Id.* (citation omitted). "Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires." *Id.* (citations and internal quotation marks omitted). To meet the third criterion, the testimony must be "based on sufficient facts or data" and be "the product of reliable principles and methods," and the expert must have "reliably applied the principles and methods to the facts of the case." *Id.* (quoting Fed. R. Evid. 702(b)–(d)).

"Federal Rule of Evidence 702 reflects an attempt to liberalize the rules governing the admission of expert testimony." *Shuck v. CNH Am., LLC*, 498 F.3d 868, 874 (8th Cir. 2007) (citing *Lauzon*, 270 F.3d at 686). The rule "favors admissibility if the testimony will assist the trier of fact." *Clark v. Heidrick*, 150 F.3d 912, 915 (8th Cir. 1998). Doubt regarding "whether an expert's testimony will be useful should generally be resolved in favor of admissibility." *Id.* (citation and internal quotation omitted).

Under Rule 702, the trial court has a gatekeeping responsibility to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Kumho*

*Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (citing *Daubert*, 509 U.S. at 597).  "When making the reliability and relevancy determinations, a district court may consider:  (1) whether the theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review or publication; (3) whether the theory or technique has a known or potential error rate and standards controlling the technique's operation; and (4) whether the theory or technique is generally accepted in the scientific community."  *Russell v. Whirlpool Corp.*, 702 F.3d 450, 456 (8th Cir. 2012) (citing *Daubert*, 509 U.S. at 593–94).  "This evidentiary inquiry is meant to be flexible and fact specific, and a court should use, adapt, or reject *Daubert* factors as the particular case demands."  *Unrein v. Timesavers, Inc.*, 394 F.3d 1008, 1011 (8th Cir. 2005).  "There is no single requirement for admissibility as long as the proffer indicates that the expert evidence is reliable and relevant." *Id.*

"If the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury, it must be excluded."  *Neb. Plastics, Inc. v. Holland Colors Ams., Inc.*, 408 F.3d 410, 416 (8th Cir. 2005) (quoting *Hartley v. Dillard's, Inc.*, 310 F.3d 1054, 1061 (8th Cir. 2002)). An expert opinion is fundamentally unsupported when it "fails to consider the relevant facts of the case." *Id.* With this standard in mind, the Court addresses the United States' motions.

## III.    Discussion

The Fifth Amendment enshrines a landowner's right to "just compensation" when the federal government takes private land for public use.  U.S. Const. amend. V.  The Supreme Court has "repeatedly held that just compensation normally is to be measured by 'the market value of the property at the time of the taking contemporaneously paid in money.'"  *United States v. 50 Acres of Land*, 469 U.S. 24, 29 (1984) (quoting *Olson v. United States*, 292 U.S. 246, 255 (1934)).  Under this standard, "the owner is entitled to receive 'what a willing buyer would pay

6

in cash to a willing seller' at the time of the taking." *United States v. 564.54 Acres of Land*, 441 U.S. 506, 511 (1979) (citations and internal quotation marks omitted).

Among the factors relevant to determining market value is the highest and best use (HBU) of the property. *See Olson*, 292 U.S. at 255–56. When evaluating the admissibility of HBU evidence, "the trial judge should screen the evidence" and then decide "whether the landowner has produced credible evidence that a potential use is reasonably practicable and reasonably probable within the near future." *United States v. 341.45 Acres of Land*, 633 F.2d 108, 111 (8th Cir. 1980) (citation and internal quotation marks omitted). The trial judge's screening of the evidence, however, "does not require an extensive and detailed review of all the evidence." *Id.* at 111–12. "Rather, the judge need only find that there is credible evidence that the property is adaptable to the use and that there will be a need or demand for such use in the near future." *Id.* at 112. After such a credibility finding, it is the province of the fact-finder to determine "whether the property's suitability for this use enhances its market value, and, if so, by how much." *Id.* at 111 (citation omitted).

Here, the United States seeks to exclude three opinions of value and HBU that Liberty Plaza presents. The Court addresses the United States' arguments regarding each witness in turn.

   **a. Justin Strohm**

First, the Court finds that Liberty Plaza has satisfied the threshold burden of presenting credible evidence that the use of the property for a quick-service restaurant is "reasonably practicable and reasonably probable within the near future." *Id.* (citation omitted). Strohm testified that a quick-service restaurant would satisfy the "standard requirements for determining a property's highest and best use:" it complied with applicable laws and zoning rules; the ease of accessibility to the site rendered it physically feasible; a sufficient supporting "daytime

7

population" rendered it financially feasible; and it was "most likely to get the type of return in the period of return that [Liberty Plaza] wanted without . . . any outlays." *See* doc. 55-1, Strohm Dep. at 98:10–99:21. He also testified that "[t]here are quick-service restaurants across the street that have been there for some time." *Id.* at 44. That evidence suffices to credibly show demand and reasonable practicability for Strohm's proffered use.

The United States counters that Strohm failed to follow the established framework because his short expert report fails to properly consider the financial feasibility of his proposed HBU. Doc. 49-1 at 12–16. It argues that Strohm has failed to "establish a 'reasonable probability that . . . there is a need or demand for such use in the reasonably near future,'" *id.* at 14 (quoting *341.45 Acres of Land*, 633 F.2d at 111), because he "did not 'present market studies showing a sufficient demand'" for his proposed HBU, *id.* at 15 (quoting *United States ex rel. Tenn. Valley Auth. v. 1.72 Acres of Land*, 821 F.3d 742, 755 (6th Cir. 2016)). "Even a preliminary investigation into potential market demand," the United States insists, would have revealed that "[t]he traffic count for the Property is . . . far below the minimum traffic count" necessary to support Strohm's HBU. Doc. 49-1 at 15. But these arguments merely attempt to raise the standard for admissibility of HBU testimony. In the Eighth Circuit, a showing of HBU simply "requires a showing of reasonable probability that the land is both physically adaptable for such use and that there is a need or demand for such use in the reasonably near future." *341.45 Acres of Land*, 633 F.2d at 111. On the question of demand in particular, the law of this circuit requires "credible evidence" thereof, not necessarily market studies. *See id.* at 112. "[T]here must be some evidence," the Eight Circuit has explained, "that others have developed and sold such lots, so as to establish a trend, at least, toward that type of development." *Id.* To that end, Strohm testified not only that a sufficient daytime population existed to support his

proposed HBU of a quick-service restaurant, but that such restaurants in fact already exist "across the street that have been there for some time."  Doc. 55-1, Strohm Dep. at 98:21–99:6. The longtime existence of such restaurants in such close proximity to the subject property provides credible evidence not only of the financial feasibility of Strohm's proposed HBU, but also to show that sufficient demand exists to support it.  Accordingly, the Court leaves it to the fact-finder to ascertain "whether the property's suitability for this use enhances its market value, and, if so, by how much."  *341.45 Acres of Land*, 633 F.2d at 111 (citation omitted).

Further, the Court finds that Strohm's testimony satisfies the rigors of Rule 702.  The Eighth Circuit has explained that first, the evidence must be "useful to the finder of fact in deciding the ultimate issue of fact."  *Lauzon*, 270 F.3d at 686.  The parties do not dispute that Strohm's testimony as a real-estate broker would be useful to the jury in determining the value of the subject property.  *See* docs. 49-1, 55, 60.  The Court agrees that the specialized knowledge of a real-estate broker would be helpful to the jury in this case, where only the question of just compensation remains.  Second, the Eighth Circuit has explained that "the proposed witness must be qualified to assist the finder of fact."  *Lauzon*, 270 F.3d at 686.  The United States argues that because Strohm used a "flawed definition of market value," that mistake is "a dead giveaway that he lacks [the] 'specialized knowledge' necessary to provide an opinion of value," doc. 49-1 at 12.  But still, the United States does not contest Strohm's qualifications:  he has worked as a licensed real-estate broker for at least eight years, he previously worked as an analyst predicting auction values of distressed properties in the City of St. Louis, he has taken continuing education courses to maintain his brokerage license, and he regularly advises clients regarding the worth of their real property on the market.  *See* doc. 55-1, Strohm Dep. at 9:12–15, 9:25–10:11, 16:2–15.  On the basis of those qualifications, even assuming Strohm used a flawed

9

definition of market value, the Court finds, by a preponderance of the evidence, Strohm qualified at least by experience and training to assist the finder of fact.  *See* Fed. R. Evid. 702.

Last, "the proposed evidence must be reliable or trustworthy in an evidentiary sense," such that it is "based on sufficient facts or data," "the product of reliable principles and methods," and based on the reliable application of those principles to the facts.  *Lauzon*, 270 F.3d at 686 (quoting Fed. R. Evid. 702(b)–(d)).  Here, Strohm effectively used the "sales-comparison approach" to real-estate valuation, which is "normally preferred in federal acquisitions as the best evidence of value."  Uniform Appraisal Standards for Federal Land Acquisitions § 4.4.2 (2016) ("Yellow Book"); *see Tech. Coll. of the Low Country v. United States*, 145 Fed. Cl. 408, 426 (Fed. Cl. 2019) ("Appraisers not employed by the government are not bound by the Yellow Book . . . but the appraisal standards described in the Yellow Book are consistent with appraisal industry standards" (citation omitted)).  On this approach, one "form[s] an opinion of a property's market value through comparison with . . . comparable sales."  Yellow Book § 4.4.2.  Comparability, in turn, "is largely a function of three variables:  characteristics of the properties, their geographic proximity to one another, and the time differential."  *Id.* § 4.4.2.1.  Accordingly, to conduct his evaluation, Strohm considered the listings of two properties he found comparable in nearby neighborhoods, *see* doc. 49-4 at 5, and adjusted upwards from the more comparable of the two properties to "a number that [he] felt was marketable," doc. 55-1, Strohm Dep. 82:21–83:3.

The United States makes four distinct arguments to exclude Strohm's testimony:  first, that he used a flawed definition of market value, doc. 49-1 at 7–8; second, that Strohm did not sufficiently explain his adjustments from the comparable properties when making his final valuation, *id.* at 9; third, that he used property listings rather than sales to conduct his

10

comparison, *id.* at 8–10; and fourth, that those properties do not best compare to the subject

property, *id.* at 10–11.  The Court addresses and rejects each, in turn.

First, "just compensation normally is to be measured by the market value of the property

at the time of the taking contemporaneously paid in money," *50 Acres of Land*, 469 U.S. at 29

(citation and internal quotation marks omitted), meaning that "the owner is entitled to receive

what a willing buyer would pay in cash to a willing seller at the time of the taking," *564.54 Acres*

*of Land*, 441 U.S. at 511 (citations and internal quotation marks omitted).  Strohm stated in his

report that he defined market value as "what Mr. Nasser would have been willing to sell the

property for given his strong preference to keep the property and enter into a ground lease."

Doc. 49-4 at 4.  Whatever the difference between those formulations, Strohm's actual methods

for determining value—i.e., looking to the price of comparable properties—more likely than not

reflects his use of a reliable method (namely, the sales-comparison approach).  In fact, he valued

one of the two comparable properties identified in his report at nearly $2.9 million—far higher

than the $2.1 million valuation he eventually reached for the subject property.  Doc. 49-4 at 5.

That valuation suggests that Strohm did not simply vary upward from comparable properties to

accommodate his client's personal preferences.  And of course, the preponderance of evidence

standard itself contemplates that evidence to the contrary may exist, so if Strohm indeed

permitted his valuation to vary upward on the basis of his client's personal preferences, the

United States may present evidence on that subject to the fact-finder for its consideration.  *See*

Fed. R. Evid. 702(c) (requiring only that an expert opinion be "more likely than not . . . the

product of reliable principles and methods" before reaching the fact-finder); *Fox v. Dannenberg*,

906 F.2d 1253, 1257 (8th Cir. 1990) (explaining that when an expert is "sufficient to cross the

threshold of admissibility" but "not unassailable," "it is for the jury, with the assistance of vigorous cross-examination, to examine the worth of the opinion" (cleaned up)).

Second, the United States urges the Court to exclude Strohm's testimony because of what it calls his "unexplained and unquantified [price] adjustments to [the] two property listings" identified in his report. Doc. 49-1 at 9. It complains that Strohm "fails to explain in adequate detail how he adjusted the two listing prices . . . to arrive at his per unit valuation." *Id.* But Strohm does explain his adjustments: he testified that one of the two properties identified in his report better compares to the subject property than the other, and then that he adjusted upward from the value of the more comparable property to a price he believed marketable for the subject property, because the subject property's proximity to other institutions made it "more valuable on a foot-by-foot basis." *See* doc. 55-1, Strohm Dep. at 81:17–83:3. The United States cites no binding authority for the proposition that Strohm need make a more detailed quantitative explanation of his adjustments to satisfy Rule 702. *See* doc. 49-1 at 8–9. Nor does it claim that valuations may not include adjustments of any kind. *See id.* In fact, the Yellow Book itself contemplates that such "qualitative" adjustments, rather than "quantitative" ones, "may be appropriate." Yellow Book, § 4.4.2.2. Accordingly, the Court finds it more likely than not that Strohm's adjustments rest on sufficient facts, and that any further challenges to Strohm's opinion and adjustments go to weight not admissibility. *See Dannenberg*, 906 F.2d at 1257.

Third, the United States argues that the Court should exclude Strohm's opinions because he used listings, rather than sales, to conduct his comparison. Doc. 49-1 at 8–10. The United States cites only one case for the proposition that Strohm may not use listings to conduct his comparative analysis, *see id.* at 9–10 (citing *United States v. 158.24 Acres of Land*, 696 F.2d 559, 565 (8th Cir. 1982)), but that reading misunderstands the Eighth Circuit: there, the Court

12

simply held that a court may not consider a landowner's own offer to sell as evidence of fair market value. *See 158.24 Acres of Land*, 696 F.2d at 565. In fact, another expert in this case has testified that one may use listings when conducting the sales-comparison approach. *See* doc. 55-2, Atkinson Dep. at 51:4–8 (deposition of Linda Atkinson, whose qualifications as an expert in real-estate appraisal the United States does not dispute). And although the Yellow Book counsels against using listings in the sales-comparison approach, *see* Yellow Book § 4.4.2.4.6, the Yellow Book does not bind experts not employed by the government, *see Tech. Coll. of the Low Country*, 145 Fed. Cl. at 426. On this point, the Yellow Book notably relies on *Sharp v. United States*, 191 U.S. 341 (1903), which stands for the more narrow proposition that *oral* offers to sell, not necessarily offers to sell more generally, do not tend to show value. *See* Yellow Book § 4.4.2.4.6 (quoting *Sharp*, 191 U.S. at 349). Accordingly, to the extent that the United States believes Strohm's listings do not best reflect the subject property's market value, the Court leaves that argument for the consideration of the fact-finder. *See Dannenberg*, 906 F.2d at 1257.

Finally, the United States urges the Court to exclude Strohm's opinions because it believes the two listings for properties on which he bases his valuation do not best compare to the subject property. Doc. 49-1 at 10–11. But simply because the United States believes Strohm could have considered better properties, or reached a different result, does not keep his opinion from clearing the Rule 702 threshold. The Eighth Circuit has explained that "even where there were some flaws in the experts' methods, if the testimony is within the range where experts might reasonably differ, the jury, not the trial court, should be the one to decide among the conflicting views of different experts." *Hill v. Sw. Energy Co.*, 858 F.3d 481, 486 (8th Cir. 2017) (cleaned up). Here, if the United States believes that Strohm should have considered

different comparable properties, it may challenge Strohm's opinion on that ground before the jury.

In short, Strohm's opinion is not "so fundamentally unsupported that it can offer no assistance to the jury [and therefore] must be excluded." *Nebraska Plastics, Inc.*, 408 F.3d at 416 (citation omitted).  Because his testimony clears the Rule 702 threshold, the United States' arguments for rejecting Strohm's opinions are now for the fact-finder to consider at Strohm's cross-examination. *See Dannenberg*, 906 F.2d at 1257.

### b.  Linda Atkinson

The Court finds that Liberty Plaza has satisfied the threshold burden of presenting credible evidence that the use of the property for "commercial development as demand warrants" is "reasonably practicable and reasonably probable within the near future." *341.45 Acres of Land*, 633 F.2d at 111 (citation omitted).  Atkinson testified that she considered four factors in making her determination:  legal permissibility, physical possibility, financial feasibility, and maximum productivity.  Doc. 52-5, Atkinson Dep. at 32:20–24.  Though she concedes that her report does not explain each element independently, Atkinson's opinion, given its high level of generality, need not include rigorous analysis to demonstrate credibility.  Instead, using the four factors as "guidelines," she considered nearby properties to conclude that the property's highest and best use would be for commercial development as demand warrants. *Id.* at 32:25–33:2.  For such a general opinion of HBU, and because Atkinson's opinion assumes the question of demand, her testimony on the basis of the four relevant HBU factors and the nature of nearby properties suffices as "credible evidence that the property is adaptable to the use and that there will be a need or demand for such use in the near future." *341.45 Acres of Land*, 633 F.2d at 112 (citation omitted).  The court need not find more than credibility at this stage, and leaves it to the

fact-finder to hear cross-examination on the further factual underpinnings of Atkinson's opinion and determine "whether the property's suitability for this use enhances its market value, and, if so, by how much. *Id.* at 111 (citation omitted).

The United States makes one argument that the Court should exclude Atkinson's opinion of HBU:  that she "did not conduct a highest and best use analysis or market analysis and did not support her highest and best use conclusion."  Doc. 52-1 at 7.  It argues that her opinion is "conclusory" because she neither provided analytical support nor presented evidence of market demand for her HBU finding, instead "recit[ing] a textbook definition of the HBU analysis" and then stating her conclusion.  *Id.* at 8.  Her HBU, the United States insists, "does not provide supporting methodology, facts, or data."  *Id.*  It also points to her deposition testimony, in which she explains that neither her report nor her work file contains any explanation for her HBU finding.  *Id.* (citing doc. 52-5, Atkinson Dep. at 31:1–14, 33:9–34:2).

But the United States cites no caselaw for the proposition that Atkinson need perform a "market analysis" before her opinion becomes admissible.  And here, Atkinson's proposed HBU is so broad as to render such "analysis" fruitless:  "commercial development as demand warrants" assumes, without opining on, the question of demand, so on that premise she need not conduct a "market analysis" to corroborate an opinion she never gave in the first place.  The United States protests that Atkinson "does not identify the type of commercial development (retail, office, multi-family, etc.), what the market demand is, or when development will happen," doc. 52-1 at 8, but then on those points, Atkinson provides no real opinion to analytically support or for the United States to exclude.  To the extent that the United States challenges the persuasiveness of Atkinson's overall valuation for failure to develop and rely on a more detailed HBU, the Court finds that Atkinson's testimony satisfies the rigors of Rule 702, so

the Court leaves such further challenges to the consideration of the fact-finder.  *See Dannenberg*, 906 F.2d at 1257.  The Court finds that Atkinson's testimony satisfies the rigors of Rule 702 for the following reasons.  First, the evidence must be "useful to the finder of fact in deciding the ultimate issue of fact."  *Lauzon*, 270 F.3d at 686.  Here, the parties do not dispute that appraisal testimony would help the jury in a takings case, *see* docs. 52-1, 57, 58, and the Court agrees that appraisal testimony would help the fact-finder here—after all, valuation is the lone issue in this case.  The United States protests that Atkinson's testimony in particular would not help the jury because it argues that she valued the property as of January 13, 2022, rather than the actual date of the taking, October 19, 2022.  Doc. 52-1 at 14.  Because she valued the subject property in January 2022, the United States argues, her valuation cannot be helpful to the fact-finder's determination of just compensation for a taking performed nine months later.  *Id.*  But although the date listed on Atkinson's report states January 13, 2022, *see* doc. 52-3 at 3, Atkinson has already confirmed that her opinion of value does not change—and relies on the same valuations of the same comparable properties—after correcting the effective date to October 19, 2022.  *See* docs. 52-7–52-8 (explaining that even after correcting the effective date, the valuation and its underlying basis remained the same).  Accordingly, the Court finds that Atkinson's testimony not only remains relevant, but would help the fact-finder "in deciding the ultimate issue of fact." *Lauzon*, 270 F.3d at 686.

Second, "the proposed witness must be qualified to assist the finder of fact." *Lauzon*, 270 F.3d at 686.  The United States does not dispute Atkinson's qualifications to give an opinion, *see* docs. 52, 58, and the Court finds that Atkinson is qualified by skill, experience, training, and education to assist the finder of fact, *see* Fed. R. Evid. 702.

Last, "the proposed evidence must be reliable or trustworthy in an evidentiary sense," such that it is "based on sufficient facts or data," "the product of reliable principles and methods," and based on the reliable application of those principles to the facts. *Lauzon*, 270 F.3d at 686 (quoting Fed. R. Evid. 702(b)–(d)).  The Court finds that Atkinson's testimony satisfies these conditions.  Atkinson used the sales-comparison approach to valuation, doc. 57-2 at 8, which reflects her use of "reliable principles and methods," *Lauzon*, 270 F.3d at 686 (quoting Fed. R. Evid. 702(c)).  She considered four properties she deemed comparable to the subject property, doc. 57-2 at 16–17, reflecting the use of sufficient facts and data.  She adjusted the significance she assigned to the sale price of each of the four properties on the basis of 13 elements—such as size, shape, zoning restrictions, and the like—each of which might increase or decrease the comparability of each property to the subject property.  *Id.* at 18–21.  Based on that comparison, Atkinson valued the subject property, which spanned 23,966 square feet, at $27.00 per square foot, yielding an overall valuation of $647,082 (which she rounded to $650,000).  *Id.* at 22.  That valuation reflects Atkinson's reliable application of the sales-comparison approach to the facts.

The United States makes three more arguments that the Court should exclude Atkinson's testimony.  First, it insists that the Court exclude Atkinson's testimony because she failed to identify and rely on adequate comparable sales.  Doc. 52-1 at 9–10.  Second, it insists that the Court exclude Atkinson's testimony because she "did not explain or support her adjustments." *Id.* at 10–13.  Third, it insists that the Court exclude her testimony specifically as to Comparable Sale 4, because it does not reasonably compare to the subject property.  *Id.* at 15–16.  Again, Liberty Plaza, the proponent of Atkinson's expert testimony, need merely show, by a preponderance of the evidence, that she has reliably applied the sales-comparison approach to

sufficient facts or data. *See* Fed. R. Evid. 702(b), (d); *Lauzon*, 270 F.3d at 686. In the light of

that standard, the Court addresses and rejects each of the United States' arguments.

First, the United States argues that Atkinson conducted too narrow a search for

comparable properties because she considered only four factors—sales of vacant land, because

no building currently exists on the subject property; the time period from 2019 to 2022; a two-

mile radius of the subject property; and the similarity of zoning restrictions between the subject

property and other properties—leaving her with "only" four properties to consider. Doc. 52-1

at 10. But the United States does not explain what other factors it claims she should have

considered. *See id.* And to the contrary, those four factors reflect Atkinson's efforts to narrow

the field of potential properties to those most likely comparable to the subject property. That

effort adheres to the sales-comparison approach because it aims to derive a valuation of the

subject property by considering only comparable properties. *See* Yellow Book § 4.4.2. That the

United States would have preferred she use more, different, or fewer narrowing factors does not

bear on whether Atkinson correctly applied the sales-comparison approach. To the extent that it

believes Atkinson could have chosen better narrowing factors, the United States may present that

theory to the fact-finder at cross-examination. *See Dannenberg*, 906 F.2d at 1257.

Likewise, the United States insists that Atkinson's four comparables cannot all

reasonably compare to the subject property because two of the four feature different HBUs.

Doc. 52-1 at 9. It argues that while the HBU of one comparable sale is likely as a single-family

home, the HBU of another is likely as a large student apartment complex; because those two

HBUs differ from that of the subject property, the United States insists, Atkinson's valuation "is

an unreliable indication of value and must be excluded." *Id.* But the United States cites no

caselaw for the proposition that appraisers must only consider properties sharing the same HBU,

and based on Atkinson's four narrowing factors, the Court find the properties sufficiently comparable to warrant her consideration.  To the extent that the United States believes those properties do not best reflect the value of the subject property, it may develop the point through cross-examination.  *See Dannenberg*, 906 F.2d at 1257.

The United States makes a similar argument regarding the adjustments Atkinson made to the prices of her identified comparable properties:  that the Court should exclude her testimony because she provided simply "listed 'elements of comparison,' provided a generic, textbook-style definition for each element, and listed sales that were adjusted for each element."  Doc. 52-1 at 11.  The United States argues that Atkinson should have "explain[ed] why the elements were relevant to the valuation of the Subject Property, why any specific adjustment was made to any comparable sale for a specific element, [and] the magnitude of these adjustments."  *Id.*  "For each of these adjustments," the United States concludes, Atkinson "provides no data, facts, or underlying methods or calculations."  *Id.* at 13.  But the United States does not explain why the more limited explanation Atkinson does provide fails to satisfy Rule 702, nor does it explain why it could not have sussed out these details in deposition.  The Yellow Book itself explains that "[d]epending on the property involved and the relevant market, the appraiser may need to adjust each comparable sale through quantitative and/or qualitative analysis to derive an indication of the market value of the subject property."  Yellow Book § 4.4.2.2.  Atkinson has done just that, listing the relevant elements affecting adjustments, identifying how certain elements affected certain comparable properties, then providing a chart listing the applicable property adjustments for each comparable property.  *See* doc. 52-3 at 18–21.

Again, the United States raises issues that go to the weight, not the admissibility, of Atkinson's testimony.  By a preponderance of the evidence, the Court finds that such analysis

reflects Atkinson's faithful application of the elements of comparison to her four identified comparable properties.  *See id.*

Last, the United States similarly argues that the Court should exclude Atkinson's testimony specifically as to Comparable Sale 4 because its HBU differs from that of the subject property.  Doc. 52-1 at 15–16.  A nearby university "purchased Comparable Sale 4 to expand its campus and build a student apartment complex," the United States explains, giving it a different HBU from the subject property and "a pre-adjustment price over 2.5 times greater" than the next-highest priced of Atkinson's comparable properties.  *Id.* at 15.  The United States argues that those differences "make Comparable Sale 4 a poor indicator of the Subject Property's value and an inappropriate comparable property."  *Id.*  But as the Court has already explained, Atkinson has reliably applied the sales-comparison approach in her effort to narrow the field of comparable properties, and in any event, Atkinson herself has acknowledged Comparable Sale 4 as an "outlier," and that accordingly, she "did not give it the same weight as the other [comparable] sales" in her final valuation of the subject property.  Doc. 57-1, Atkinson Dep. at 80:23–81:1.  The United States' disagreement with her choice of comparable properties again bears on weight not admissibility; accordingly, to the extent that the United States believes that any property does not best reflect the market value of the subject property, it may present that theory to the fact-finder.  *See Dannenberg*, 906 F.2d at 1257.

### c.   Liberty Plaza

Finally, the United States makes four distinct arguments for excluding Liberty Plaza's opinions of value and HBU.  *See* doc. 51-1.  First, it argues that Liberty Plaza's representative, Nasser, does not have sufficient experience to qualify as an expert under Rule 702, and therefore cannot provide opinions of value and HBU because those are fundamentally expert opinions.  *Id.*

20

at 2.  Second, it argues that Liberty Plaza's opinions do not rely on "sufficient facts or data," and therefore do not satisfy Rule 702.  *Id.* at 2–3.  Third, it argues that Liberty Plaza's opinions do not reflect "the reliable application of established methodologies as Rule 702 requires."  *Id.* at 3 (cleaned up).  Fourth, it argues that Liberty Plaza did not properly disclose Liberty Plaza's expert opinions as required by the Federal Rules of Civil Procedure governing expert disclosure.  *Id.* at 3–4.

But each of those arguments assumes the premise that Liberty Plaza's opinions of value and HBU constitute expert testimony requiring compliance with Rule 702.  That premise conflicts with longstanding Eighth Circuit precedent.  Here, Nasser is testifying in his capacity as the representative of Liberty Plaza, which owns the subject property.  *See* doc. 51-4.  The Eighth Circuit has long held that courts may admit the opinion testimony of a landowner regarding the valuation of his land simply based on "a presumption of special knowledge arising out of ownership."  *United States v. 3,698.63 Acres of Land*, 416 F.2d 65, 67 (8th Cir. 1969) (citation omitted).  The United States resists this conclusion, arguing that nevertheless, Nasser's testimony must satisfy the rigors of Rule 702 to gain admissibility.  *See* doc. 51-1 at 8–9.  It points specifically to the advisory committee's notes accompanying the proposal of Rule 702 before its adoption in 1975, *see id.* at 8, which theorize that "within the scope of the rule are . . . the large group sometimes called 'skilled' witnesses, such as . . . landowners testifying to land values," *see* Fed. R. Evid. 702 advisory committee's notes on proposed rules.   The United States argues that per that language, landowners testifying to land values fall "within the scope of the rule" and therefore must satisfy each of the rule's requirements.  *See* doc. 51-1 at 8.  And although that argument conflicts with the Eighth Circuit's holding in *3,689.63 Acres of Land*, the United States argues that that case no longer governs because it pre-dates Congress's enactment of Rule 702 in

1975.  *See* doc. 59 at 5.  In other words, it reasons that Rule 702, as explained by the advisory committee's notes accompanying its promulgation in 1975, must have "abrogated" the Eighth Circuit's decision and raised the bar for the admissibility of a landowner's testimony as to the value of his land.  *See id*.  To be clear, however, the United States does not argue that post-1975 amendments to Rule 702 have any impact on the landowner-testimony rule.  *See* docs. 51-1, 59. The United States therefore pins its entire argument on the 1975 adoption of Rule 702.  Because the Eighth Circuit approvingly cited *3,689.63 Acres of Land* for that rule in 1983, the United States' arguments fail.

That year—eight years after the enactment of Rule 702 and the publication of its accompanying notes—the Eighth Circuit reaffirmed that "[a] landowner is presumed to have special knowledge of his property.  His testimony as to the value of his land is therefore 'admitted in federal courts without further qualification.' . . . This is true even when the landowner's figures exceed the assessments made by expert witnesses."  *United States v. 79.20 Acres of Land*, 710 F.2d 1352, 1357 (8th Cir. 1983) (quoting *3,698.63 Acres of Land*, 416 F.2d at 66–67).  The advisory committee's notes, in other words, did not persuade the Eighth Circuit to abandon that longstanding doctrine.  The adoption of Rule 702 did not abrogate Eighth Circuit doctrine; instead, it remains the law of this circuit that instead of needing to satisfy the rigors of Rule 702 as "expert testimony," courts may admit a landowner's testimony of value "without further qualification."  *Id.*

Because Nasser is testifying in his capacity as representative for the landowner of the subject property, his testimony need not satisfy Rule 702.  *See id.* (distinguishing between the opinions of a landowner and those of expert witnesses).  Accordingly, the United States' four principle arguments for excluding Nasser's testimony fail.  In closing, the United States argues

that even if Nasser's testimony need not comply with Rule 702, the Court should exclude his opinions because they "lack factual support" and merely seek compensation for lost business opportunities.  Doc. 51-1 at 15–16; *see also* doc. 59 at 8–13.  Even putting aside the Eighth Circuit's insistence that courts admit a landowner's testimony of value "without further qualification," *see 79.20 Acres of Land*, 710 F.2d at 1357 (quoting *3,698.63 Acres of Land*, 416 F.2d at 67), the Court disagrees with the United States' characterization:  Nasser explained that Liberty Plaza's valuation considered the size of the lot, its location in "one of the hottest areas in St. Louis," and anticipated lease revenue of $12,000 to $16,000 per month.  Doc. 56-1, Nasser Dep. at 28:3–12.  Further, Nasser recounted exchanges of offers for the sale of the property before its taking, discussions with a developer regarding the construction of an apartment complex on the property, and recent changes in property values in the area.  *See generally* doc. 56-1.

The United States points to *Rich v. Eastman Kodak Co.*, 583 F.2d 435 (8th Cir. 1978), for the proposition that courts should exclude even a landowner's opinion of value if it does not rest on a factual basis.  Doc. 51-1 at 15–16; doc. 59 at 8.  But in that case, the landowner "not only failed to present a factual basis for his valuation but denied any obligation to do so."  *Rich*, 583 F.2d at 437.  Here, by contrast, and as described above, Nasser has provided a factual basis for his opinion, and does not deny his duty to do so.  *See* doc. 56 at 4–7.  Accordingly, the Court finds that Liberty Plaza's opinions rest on a sufficient factual basis and on "credible evidence that [the proffered HBU was] reasonably practicable and reasonably probable within the near future."  *341.45 Acres of Land*, 633 F.2d at 111.  Now, "[t]he weight to be given to [such] factual and opinion evidence . . . is for the trier of fact."  *79.20 Acres of Land*, 710 F.2d at 1357.

## IV.    Conclusion

      The United States raises largely faint arguments that go to the weight of the opinions Liberty Plaza's witnesses offer, not the admissibility.  For the reasons explained above, the Court denies the United States' [49] Motion to exclude Justin Strohm's expert opinions, [51] Motion to exclude Liberty Plaza's opinions, and [52] Motion to exclude Linda Atkinson's expert opinions.

      So ordered this 6th day of March 2024.

STEPHEN R. CLARK
CHIEF UNITED STATES DISTRICT JUDGE

24